UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------- X

OSCAR ANTONIO MOYA
BARAHONA, on behalf of himself and all
others similarly situated

             **Plaintiff,**

      **- against -**

JANET NAPOLITANO, Secretary of
Homeland Security, and ALEJANDRO
MAYORKAS, Director of United States
Citizenship and Immigration Services,

           **Defendants.**

-------------------------------------------------- X

**OPINION AND ORDER**

**10 Civ. 1574 (SAS)**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _10/11/11_

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

I.     **INTRODUCTION**

        Oscar Antonio Moya Barahona ("Moya") brings this putative class

action against Janet Napolitano, Secretary of Homeland Security, and Alejandro

Mayorkas, Director of United States Citizenship and Immigration Services

("USCIS") ("Defendants"), in their official capacities.  Moya alleges that in

promulgating two regulations – the Adjustment of the Immigration and

Naturalization Benefit Application and Petition Fee Schedule, effective July 30,

2007 (the "2007 Regulation"), and the U.S. Citizenship and Immigration Services

1

Fee Schedule, effective November 23, 2010 (the "2010 Regulation") – USCIS has

exceeded its authority under section 286(m) of the Immigration and Nationality

Act ("INA"),[1] and that the Regulations are arbitrary, capricious, an abuse of

discretion, and not in accordance with law.[2]  Specifically, Moya alleges that the

Regulations "bundle" fees for services, with the result that a large number of

applicants pay for services that they do not want or need, cannot use, or do not

receive, and that the Regulation establishes fees at rates that improperly include the

costs of USCIS activities and expenses that are, at best, distantly related to the

provision of services to the fee-paying applicants.[3]

The parties have now cross-moved for summary judgment.  For the

reasons stated below, Moya's motion is denied and defendants' motion is granted.

## II.    BACKGROUND[4]

---

[1]    8 U.S.C. § 1356(m).

[2]    *See* Amended Complaint ("Am. Compl.") ¶ 1.

[3]    *Id.* ¶ 2.

[4]    Moya has submitted a Rule 56.1 Statement.  Instead of submitting a reply 56.1 Statement, defendants have submitted the administrative record, which constitutes more than twenty thousand pages, both in its entirety and in the form of a selected appendix.  Defendants' approach is appropriate in this Administrative Procedure Act ("APA") case.  *See Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985) ("[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court."  *Camp v. Pitts*, 411 U.S. 138, 142 (1973).  The task of the

2

A.      **The Parties**

Since 2003, the Department of Homeland Security ("DHS"), through its component agency, USCIS, has been responsible for granting or denying immigration benefits to individuals, including naturalization, permanent residence, and asylum.[5]  In connection with permanent residence applications, individuals may seek two interim benefits: employment authorization and travel documents.[6] The former allows an applicant to work while her permanent residency application is pending, while the latter allows the applicant to leave the United States without relinquishing her application for permanent residence.[7]

Moya is a twenty-year-old citizen of Honduras who resides in the

---

reviewing court is to apply the appropriate APA standard of review, 5 U.S.C. § 706, to the agency decision based on the record the agency presents to the reviewing court.  *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402 (1971)").  Accordingly, I do not deem admitted every statement in Moya's 56.1 Statement simply because defendants have not submitted a reply 56.1 Statement. For the factual background of this case, I draw upon the extensive factual narratives in the parties' briefs, much of which is undisputed, and which is, in turn, largely drawn from the administrative record.

[5]      *See* Memorandum of Law in Support of DHS's Motion for Summary Judgment ("Def. Mem.") at 3-4 (citing Pub. L. No. 107-296 §§ 102(a)(3), 451(b), 116 Stat. 2135, 2143, 2196  ("Homeland Security Act of 2002")); Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment ("Pl. Mem.") at 3-4 (citing Homeland Security Act of 2002; 6 U.S.C. §§ 251, 271, 291).

[6]      *See* Def. Mem. at 4.

[7]      *See id.*

3

Bronx, New York.[8]  On March 5, 2008, he applied for adjustment of status

pursuant to section 245(h) of the INA, and paid the $930 fee plus the $80 fee for

biometric services.[9]  On March 25, 2008, Moya applied for the interim benefit of

employment authorization "because he was required to pay for it as a condition of

applying for permanent residence and determined that, should the adjudication of

the permanent residence application be delayed, an employment authorization card

could serve as a form of identification."[10]  As a full-time high school student, he

had no intention or need to work at the time.[11]

On April 24, 2008, his application for adjustment of status was

granted.[12]  His employment authorization was approved approximately one month

later, on May 20, 2008.[13]  Because lawful permanent residency status automatically

confers authorization to work, the employment authorization document was

"worthless" to Moya by the time it was issued.[14]  Moya did not apply for a travel

---

[8]     *See* Am. Compl. ¶ 5.

[9]     *See id.* ¶ 54.

[10]    *Id.*

[11]    *See id.*

[12]    *See id.* ¶ 55.

[13]    *See id.*

[14]    *Id.*

document, as he had no intention of traveling.[15]  In fact, had he traveled at that time, even with a travel document, there is a significant likelihood he would not have been permitted to re-enter the United States.[16]  Thus, Moya was required to pay for the two interim benefits, even though he had no intention of working or traveling during the pendency of his application for lawful permanent residence.[17]

Moya alleges that he will also be subject to fees under the 2010 Regulation.  He will be eligible for naturalization on April 24, 2013, and if he decides to naturalize, he will need to file an Application for Naturalization (Form N-400) and pay the $595 filing fee.[18]  If he chooses not to naturalize, his permanent resident card will have to be renewed when it expires on April 24, 2018, so he will have to file an Application to Replace Permanent Resident Card (Form I-90) and pay the $365 filing fee.[19]

B.    **The Historical Background and Statutory Scheme Governing Immigration and Naturalization Fees**

---

[15]    *See id.*

[16]    *See id.*

[17]    *See id.*

[18]    *See id.* ¶ 56.

[19]    *See id.*

Congress enacted the INA[20] to create a "'comprehensive federal statutory scheme for [the] regulation of immigration and naturalization.'"[21]  Until the creation of DHS in 2003, the Attorney General was responsible for administering immigration and naturalization benefits.[22]  The Department of Justice ("DOJ"), through its component agency, Immigration and Naturalization Services ("INS"), collected fees for processing and adjudicating immigration and naturalization applications pursuant to its promulgated regulations.[23]

Prior to 1988, the INS's fee-setting authority was principally based on the Independent Offices Appropriations Act of 1952 ("IOAA"), which permitted federal agencies to collect user fees for "'a service or thing of value provided by the agency.'"[24]  Those fees were deposited with the U.S. Treasury as "miscellaneous receipts."[25]  The costs of the INS's administration of immigration

---

[20]    8 U.S.C. §§ 1101-1537.

[21]    Def. Mem. at 5 (quoting *De Canas v. Bica*, 424 U.S. 351, 353 (1976)).

[22]    *See id.* (citing 8 U.S.C. § 1103 (2000)).

[23]    *See id.* (citing *Ayuda Inc. v. Attorney General*, 848 F.2d 1297, 1299 (D.C. Cir. 1988)).

[24]    *Id.* (quoting IOAA, 31 U.S.C. § 9701(b)).  *Accord* Pl. Mem. at 5 (same).

[25]    8 U.S.C. § 1356(c).

and naturalization benefits was funded entirely by Congressional appropriations.[26]

In 1988, Congress enacted INA sections 286(m) and 286(n).[27] Through that legislation, Congress directed that the expenses of administering immigration and naturalization benefits would be funded with the fees collected by the INS for its processing and adjudication of applications.[28]  Pursuant to section 286(m), Congress established the Immigration Examinations Fee Account ("IEFA") as the depository for "all adjudication fees."[29]  Under section 286(n), fees deposited in the IEFA were to be used to fund the "expenses in providing immigration adjudication and naturalization services."[30]  Additionally, under section 286(j), the Attorney General had the authority to "prescribe such rules and regulations as may be necessary to carry out" sections 286(m) and (n), among others.[31]  The conference report that accompanied the 1988 legislation noted that

---

[26]     *See* U.S. Citizenship and Immigration Services Fee Schedule, Final Rule, 75 Fed. Reg. 58,962, 58,966 (Sept. 24, 2010) (AR 17080, 17084).

[27]     *See* Def. Mem. at 6.

[28]     *See id.*

[29]     8 U.S.C. § 1356(m).

[30]     *Id.* § 1356(n).

[31]     *Id.* § 1356(j).

the IEFA funds were for "'enhancing naturalization and adjudication programs.'"[32]

In 1990, Congress amended section 286(m) to provide:

> that fees for providing adjudication and naturalization services may be set at a level that will ensure recovery of *the full costs of providing all such services*, including the costs of similar services provided without charge to asylum applicants or other immigrants. Such fees may also be set at a level that will recover any additional costs associated with the administration of the fees collected.[33]

The House Appropriations Committee recognized that the purpose of the 1990 amendment was to ensure that the IEFA funds would fund "'the entire cost of operating the Adjudications and Naturalization program.'"[34]

In 2002, the INS was abolished and DHS was established.[35] Congress transferred to DHS responsibility for adjudicating immigration and naturalization benefits, functions that are performed by USCIS.[36] Through that process, defendants assert that "Congress reaffirmed that fees, and primarily the IEFA

---

[32]   Def. Mem. at 6 (quoting H.R. Rep. No. 100-979 at 38 (1988)).

[33]   8 U.S.C. § 1356(m) (emphasis added).

[34]   Def. Mem. at 7 (quoting Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act for 1991, Hearings Before the Subcommittee of the Committee on Appropriations, 101st Cong., at 72 (1990)).

[35]   *See* Pub. L. No. 107-296 §§ 101, 102, 441, 451, 471, 1102.

[36]   *See id.* §§ 451(b), 441; 116 Stat. at 2196, 2192.

application fees, should fund the full cost of USCIS's processing and adjudicatory functions."[37]  Section 477 of the Homeland Security Act ("HSA") "directs the Comptroller General of the United States to report to Congress, within one year, on 'whether [USCIS] is likely to derive sufficient funds from fees to carry out its functions in the absence of appropriated funds.'"[38]

### C.    The 2007 and 2010 Fee Regulations

In 2007, DHS performed a comprehensive review and analysis of the level of application fees needed to fund the full costs of processing and adjudicating immigration and naturalization benefits.[39]  That review revealed that DHS needed to increase application fees for the majority of immigration and naturalization benefits, including for naturalization and permanent residence applications.[40]

DHS complied with notice-and-comment rulemaking in adjusting the

---

[37]    Def. Mem. at 7-8.

[38]    *Id.* at 8 (quoting Pub. L. No. 107-296 §§ 477(d)(3), 116 Stat. at 2211 and citing Immigration Application Fees: Current Fees Are Not Sufficient to Fund U.S. Citizenship & Immigration Services' Operations (GAO-04-309R, Jan. 5, 2004) at 2-3 (AR 1696-97)).

[39]    *See id.* (citing Adjustment of Immigration and Naturalization Benefit Application and Petition Fee Schedule, Final Rule, 72 Fed. Reg. 29,851, 29,852 (May 30, 2007) (AR 16243-44)).

[40]    *See* 72 Fed. Reg. at 29,851 (AR 16243).

IEFA fee schedule.[41]  A notice of the proposed 2007 fee regulation was issued on

February 1, 2007.[42]  DHS received more than 3,900 comments and responded to

issues raised by the comments by creating several types of fee waivers and

exemptions.[43]  The final 2007 fee regulation was published on May 30, 2007, and

took effect on July 30, 2007.[44]

     In 2010, DHS undertook another comprehensive review of the IEFA

fees, which revealed the need for further adjustment to fee levels.[45]  On June 11,

2010, DHS invited comments on a proposed fee regulation and made its cost-

modeling software available for public access.[46]  DHS received 225 public

comments, in response to which the agency waived and reduced certain fee

amounts.[47]  The final 2010 fee regulation was published on September 24, 2010

---

[41]     *See* Adjustment of Immigration and Naturalization Benefit
Application and Petition Fee Schedule, Proposed Rule, 72 Fed. Reg. at 4889 (AR
1750) (Feb. 1, 2007).

[42]     *See id.* at 4,888 (AR 1749).

[43]     *See* 72 Fed. Reg. at 29,853-54 (AR 16245-46).

[44]     *See id*. at 29,851-52 (AR 16243-44).

[45]     *See* U.S. Citizenship and Immigration Services Fee Schedule,
Proposed Rule, 75 Fed. Reg. at 33,448-49 (AR 17038-39), 33,455 (AR 17045)
(June 11, 2010).

[46]     *See id.* at 33,445, 33,447 (AR 17035, 17037).

[47]     *See id.* at 58,963-65 (AR 17081-83).

and took effect on November 23, 2010.[48]  The 2010 fee regulation superseded the

2007 fee regulation.[49]

### D.    DHS's Determinations of Appropriate Fee Levels

#### 1.    DHS's Interpretation of Its Fee-Setting Authority Under INA Section 286(m)

In the rulemaking process, DHS explained to the public its

interpretation of section 286(m) and its view that the 2007 and 2010 fee regulations

were consistent with that statutory authority.[50]  DHS considers its fee-setting

authority as deriving from INA section 286(m), not from the general authority of

IOAA for federal agencies to charge user fees.[51]  DHS accordingly views "its fee-

setting authority under section 286(m) [as] 'an exception from,' and 'broader' than,

'the stricter costs-for-services-rendered requirements under the [IOAA].'"[52]

Because section 286(m) provides for fees to be set at a level to recover the "'full

costs' of providing immigration and adjudication services and other similar

services . . . DHS determined that it is authorized to collect fees to fund the cost of

---

[48]    *See id*. at 58,962 (AR 17080).

[49]    *See* Def. Mem. at 8.

[50]    *See id.* at 10.

[51]    *See id.* (citing 72 Fed. Reg. at 4,889 (AR 1750); 75 Fed. Reg. at 33,447 (AR 17037)).

[52]    *Id.* (quoting 75 Fed. Reg. at 33,447 (AR 17037)).

improvements designed to enhance its capacity to administer immigration and

naturalization benefits, and to ensure that it administers those benefits consistent

with its statutory obligations and policy objectives."[53]  DHS's view of the

legislative history is that "Congress intended to allow DHS to set fees at a level

sufficient for funding essential investments in USCIS's technology, staffing, and

facilities."[54]

DHS also received comments during the rulemaking period in 2007

and 2010 arguing for a contrary interpretation of DHS's fee-setting authority,

based on a reading of Office of Management and Budget ("OMB") Circular A-

25.[55]  DHS considered those comments and rejected them, based on its view that

"OMB Circular A-25 did not dictate how DHS was to interpret the costs that would

permissibly be funded with IEFA fees."[56]  *First*, DHS determined that the Circular

does not control because the Circular "states that its provisions 'shall be applied'

when agencies assess 'user charges under the IOAA'" while it "only 'provides

guidance' for 'assess[ing] user charges under other statutes,'" such as INA section

---

[53]     *Id.* at 11 (quoting 8 U.S.C. § 1356(m)).

[54]     *Id.* (citing 75 Fed. Reg. at 58,966 (AR 17084) and 75 Fed. Reg. at
33,447 (AR 17037)).

[55]     *See id.*

[56]     *Id.* at 12.

286(m).[57]  *Second*, DHS determined that the Circular is an internal executive branch policy, and "thus cannot override DHS's mandate from Congress to ensure that USCIS's programs for administering immigration and naturalization benefits are fee-funded."[58]

### 2.    DHS's Projections of Costs to Be Funded by IEFA Fees

In both the 2007 and the 2010 reviews, DHS projected the "full costs of the programs, services, and projects at USCIS that should be funded by application fees."[59]  In 2007, the key priorities for USCIS included "the reduction of processing time for immigration and naturalization applications, while ensuring both the integrity of the adjudicatory process and its adherence to national security and public safety requirements."[60]  In 2010, its priorities included "maintaining the progress it had made in reducing processing time, and structuring its programs and processes to improve efficiency."[61]

In the 2007 fee review, DHS realized that "the pre-2007 IEFA fee schedule did 'no more than sustain USCIS operations and provide for delivery of

---

[57]      *Id.* (quoting OMB Circular A-25 ¶ 6.d. (AR 17178)).

[58]      *Id.* (citing 75 Fed. Reg. at 58,969 (AR 17087)).

[59]      *Id.* at 12-13.

[60]      *Id.* at 13 (citing 72 Fed. Reg. at 4,891-93 (AR 1752-54)).

[61]      *Id.* (citing 75 Fed. Reg. at 33,451-54 (AR 17041-44)).

benefits at an unacceptable level.'"[62]  DHS determined that significant expenditures

would be required in order to "preserve 'the considerable progress [it had] made ...

to reduce the backlog of immigration benefits applications and petitions."[63]  DHS

considered the lengthy delays due to backlogs as having more impact on

individuals than an increase in fees.[64]  Furthermore, "processing delays undermine

'national security and public safety' by enabling individuals who pose risks to the

public to remain in the United States."[65]

      The expenditures that were planned for FY 2008 and FY 2009

included the categories of "infrastructure enhancements," "security enhancements,"

"service enhancements," and "humanitarian enhancements."[66]  In 2010, DHS

performed similar analyses of its projected costs.[67]  "By comparing the cost

---

[62]    *Id.* at 14 (quoting 72 Fed. Reg. at 29,856 (AR 16248)).

[63]    *Id.* (quoting 72 Fed. Reg. at 4,891-92 (AR 1752-53)).

[64]    *See id.* at 14-15.

[65]    *Id.* at 15 (quoting 72 Fed. Reg. at 29,856 (AR 16254)).

[66]    *Id.* at 15-16.

[67]    *See id.* at 16-17.  Infrastructure enhancements projects, projected to
cost $244 million, included, among others, "(i) upgrading USCIS's principal
information technology systems; (ii) establishing a national employee recruitment
program and revamping professional and technical training; and (iii) leasing
additional offices appropriate for accommodating applicants seeking in-person
services."  *Id.* at 15.  Security enhancement projects, projected to cost $151
million, included, among others, "(i) delivering identification documents . . . more

projections and the revenue projections . . . DHS determined that it was necessary to adjust the level of the IEFA fees."[68]

### 3. DHS's Evaluation of Combined Fees Versus *A La Carte* Pricing

Before 2007, USCIS charged separate fees for the applications for permanent residence and for the two interim benefits of employment authorization and travel documents, even though a "significant majority" of permanent residence applicants applied for one or both interim benefits.[69]  DHS determined that "many" applicants paid multiple rounds of fees to obtain interim benefits while their permanent residence applications were pending.[70]  Additionally, separate fees increased processing costs to USCIS by requiring independent adjudication for

---

quickly and securely by using priority mail; (ii) hiring additional staff to detect fraudulent applications; and (iii) reimbursing the FBI for the cost of providing fingerprint and name checks to USCIS." *Id.* at 15-16.  Service enhancements, projected to cost $135 million, included hiring additional staff to process and adjudicate applications, training adjudication officers, and obtaining staffing for responding to FOIA requests.  *See id.* at 16.  Humanitarian enhancements, projected to cost $14 million, were directed to providing resettlement services to recent arrivals from Cuba and Haiti. *See id.*

[68]    *Id.* at 17.

[69]    *Id.* at 18 (citing 72 Fed. Reg. at 4,894 (AR 1755); *id.* at 29,861-62 (AR 16253-54); 2007 Fee Review Final Summary, at 140 (AR 1581)).

[70]    *Id.* (citing 2007 Fee Review Final Summary, at 140 (AR 1581) (in FY 2006, more than 240,000 individuals paid a second or third fee to apply for employment authorization)).

each benefit application.[71]  DHS also determined that "the system of charging separate fees . . . distorted the relationship between USCIS's efficiency in processing applications and its fee revenue – the longer it took for USCIS to adjudicate an application for permanent residence, the more it was likely to collect in application fees for the interim benefits."[72]  This gave rise to a perception of intentional delay.[73]

DHS determined that switching to a combined fee "restored the proper relationship between processing efficiency and fee revenue generation" and "lowered the total costs for the large number of applicants who would have had to pay multiple times under the old system."[74]  During the rulemaking period, USCIS considered comments suggesting that *a la carte* pricing should be offered, so as to "benefit those applicants, such as children, who may not need or desire either work authorization or travel documents."[75]  Ultimately, DHS rejected this option, "because the costs and administrative burden associated with explaining and administering such a system outweighed any benefits it offered to a subset of the

---

[71]    *See id.* at 19.

[72]    *Id.* (citing 72 Fed. Reg. at 4,894 (AR 1755)).

[73]    *See id.*

[74]    *Id.* (citing 72 Fed. Reg. at 4,894 (AR 1755)).

[75]    *Id.* (citing 72 Fed. Reg. at 29,861-62 (AR 16253-54)).

permanent residence applicants."[76]

### 4.   DHS Used Activity-Based Costing and Adjustments to Set Fees

In 2007 and 2010, DHS used activity-based costing, which "first assigns costs to different activities involved in providing services or making a product," and "then assigns the activity costs to specific products or services."[77] Following this methodology and exercising its policy judgment, DHS determined in 2007 that $930 was the appropriate fee for the application for permanent residence and two interim benefits, and that $595 was the appropriate fee for naturalization applications.[78]

## III.   APPLICABLE LAW

### A.   Principles of the Administrative Procedure Act

The APA governs judicial review of an agency's compliance with regulations, and provides a mechanism for the review of certain agency decisions. When an agency's decision is challenged, the court "begin[s] by reviewing the agency's construction of the statute at issue . . . . by applying the familiar two-step

---

[76]   *Id.* at 20 (citing 72 Fed. Reg. at 29,861-62 (AR 16253-54)).

[77]   *Id.* at 21 (citing 72 Fed. Reg. at 4,896 (AR 1757)).

[78]   *Id.* at 22 (citing 72 Fed. Reg. at 29,854 (AR 16256)).

process of statutory interpretation "[79] established by *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*[80]  The first step under *Chevron* is to inquire "'whether Congress has directly spoken to the precise question at issue;' if so, our inquiry is at [an] end."[81]  However, "[i]f there is silence or ambiguity in the statute . . . then the agency has discretion in its implementation, and we ask only if the construction it has given the statute is reasonable."[82]

Under the APA, a court must set aside an agency action, finding, or conclusion if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, . . . [or] without observance of procedure required by law."[83]  An agency decision is accorded a "presumption of regularity," and the party challenging the decision has the burden of proof.[84]  An agency decision is arbitrary and capricious if

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for

---

[79]    *Bellevue Hosp. Ctr. v. Leavitt*, 443 F.3d 163, 174 (2d Cir. 2006).

[80]    467 U.S. 837 (1984).

[81]    *Bellevue Hosp. Ctr.*, 443 F.3d at 174.

[82]    *Id.*

[83]    5 U.S.C. §§ 706 (2)(A).

[84]    *Citizens to Preserve Overton Park, Inc.,* 401 U.S. at 415.

its decision that runs counter to the evidence before the
agency, or is so implausible that it could not be ascribed to
a difference in view or the product of agency expertise.[85]

A reviewing court must make a "searching and careful" inquiry into "whether the

decision was based on a consideration of the relevant factors and whether there has

been a clear error of judgment."[86]  However, review under the APA is not available

where the relevant statute precludes judicial review or where "agency action is

committed to agency discretion by law."[87]  The APA does not apply where the

plaintiff seeks money damages.

## IV.   DISCUSSION

### A.   DHS Reasonably Interpreted Its Fee-Setting Authority Under Section 286(m) and Did Not Abuse Its Discretion

#### 1.   DHS's Interpretation of Section 286(m) Is Reasonable and Entitled to *Chevron* Deference

Moya challenges DHS's interpretation of its fee-setting authority

under section 286(m), as giving it the authority to charge fees to recover "not only

the direct costs associated with processing specific applications, but also the costs

---

[85]     *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S.
29, 43 (1983).

[86]     *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 378 (1989)
(citing *Citizens to Preserve Overton Park, Inc.,* 401 U.S. at 416).

[87]     5 U.S.C. § 701(a).

19

of projects designed to enhance its capacity to administer immigration and naturalization benefits."[88]   Moya contends, in particular, that DHS has interpreted the term "full costs" far too expansively, thereby exceeding its authority by raising fees dramatically under the 2007 and 2010 fee schedules.

I review the challenged agency action in accordance with the two-step analysis of *Chevron*.   Applying *Chevron*'s first step, I find that Congress "has [not] directly spoken to the precise question at issue."[89]   While the term "full costs" appears self-explanatory, section 286(m) contains both silence and ambiguity concerning the precise scope that "full costs" entails in this context.[90]   Therefore, DHS has discretion in implementing the statute.[91]

---

[88]     Def. Mem. at 1.

[89]     *Bellevue Hosp. Ctr.*, 443 F.3d at 174.

[90]     During the rulemaking period, DHS stated its view that section 286(m) "contains both silence and ambiguity" under *Chevron*.  75 Fed. Reg. at 58,965 (AR 17083).  The agency mentioned the lack of clear statement on "the scope of application of the section or subsidizing operations from other fees"; "the determination of what costs are to be included" in the "costs of similar services" used to pay for "asylum applicants and other immigrants"; and the definition of "other immigrants."  *Id.*  However, the agency noted its view that Congress's intent in using terms such as "full cost" is clear.  *Id.* at n.2.

[91]     As successor to the Attorney General on immigration and naturalization matters, DHS has been entrusted by Congress to "prescribe such . . . regulations as necessary" for implementing section 286(m).  Def. Mem. at 29 (citing Pub. L. No. 107-296 § 101, 116 Stat. at 2142 and quoting 8 U.S.C. § 1356(j)).  The Supreme Court has held that "*Chevron* deference is appropriate

Accordingly, I proceed to *Chevron*'s second step, and ask whether the agency's interpretation of section 286(m) is reasonable.  I find that it is.  Although Moya's interpretation of section 286(m) is also reasonable, the question is not whether the agency has made the only reasonable decision or the best possible decision, but whether it has made a reasonable decision that is permissible under the statute.  Under this narrow standard of review, I conclude, based primarily on the statutory text and the legislative history, that DHS has reasonably interpreted its fee-setting authority under section 286(m) and thus, I must accord *Chevron* deference to its interpretation.

Moya presents several arguments as to why DHS's interpretation of section 286(m) – particularly its interpretation of "full costs" –  is wrong.  *First*, Moya argues that the language of section 286(m) is clear.  As he reads the statute, "USCIS may charge 'fees' for 'providing adjudication and naturalization services' to recover the 'full costs of providing all such services.'"[92]  Moya posits that "'full costs' does not mean the 'full costs' of operating USCIS, but rather only those

---

'when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority.'"  *Mayo Found. for Med. Educ. and Research v. United States*, — U.S. —, 131 S.Ct. 704, 713 (2011) (quoting *United States v. Mead Corp.*, 533 U.S. 218, 229 (2001)).

[92]    Pl. Mem. at 17-18 (quoting 8 U.S.C. § 1356(m)).

costs "*incurred in* 'providing adjudication and naturalization services,'" which he interprets as costs "*reasonably attributable* to the adjudication and naturalization services rendered to applicants."[93]   However, he does not suggest where the line would be drawn between costs that are "reasonably attributable," and those that are not.

      *Second*, Moya argues that "full costs" means less than "the general costs to the Government"[94] of operating USCIS because it must be presumed that Congress was aware of the judicially-established difference between "fees" and "taxes" when it authorized DHS to set "fees."[95]   He notes that "Congress did not expressly delegate through § 286(m) the taxing power to USCIS, much less provide any 'intelligible principle' by which to exercise any such power."[96]

      Moya suggests further that "full costs" had a specific meaning when

---

[93]    Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment ("Pl. Opp. Mem.") at 5 (quoting 8 U.S.C. § 1356(m)) (emphasis added).

[94]    *Seafarers Int'l Union of N. Amer. v. United States Coast Guard*, 81 F.3d 179, 183 (D.C. Cir. 1996).

[95]    Pl. Mem. at 18 (citing, *inter alia*, *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 184-85 (1988) ("We generally presume that Congress is knowledgeable about existing law pertinent to the legislation it enacts.")).

[96]    *Id*. at 18-19 (quoting *National Cable Television Ass'n, Inc. v. United States* ("*NCTA*"), 415 U.S. 336, 342 (1974)).

section 286(m) was enacted, as defined in OMB Circular A-25, which "permitted agencies 'to recover the full cost' of rendering services, and, in a section entitled '[d]etermination of costs,' stated '[t]he cost computation shall cover the direct and indirect costs to the Government of carrying out the activity[.]'"[97] The Circular also stated that "a user charge is appropriate and can be 'made to each identifiable recipient for a measurable unit or amount of Government service . . . from which he derives a special benefit,' which occurs 'when a Government-rendered service . . . is performed at the request of the recipient.'"[98]

Moya claims that, at previous junctures, the agency cited Circular A-25 as guiding authority when proposing and promulgating fees under section 286(m).[99] He alleges that DHS only changed its position after this lawsuit was filed, by stating that it "'disagrees that Circular A-25 applies under INA section

---

[97]     Pl. Opp. Mem. at 19 (quoting OMB Circular A-25, Ex. 2 to Declaration of Jeffrey B. Korn, Esq., Plaintiff's Counsel, ¶¶ 3(a)(1), 5(a)).

[98]     *Id.* (quoting OMB Circular A-25 ¶ 3(a)(1)).  As Moya highlights, the Supreme Court endorsed OMB Circular A-25 in *Federal Power Comm'n v. New England Power Co.* ("*NEPCO*"), 415 U.S. 345, 351 (1974)).  *See* Pl. Opp. Mem. at 20.

[99]     *See* Pl. Mem. at 20 (citing 64 Fed. Reg. 69,883, 69,884 (Dec. 15, 1999) (codified at 8 C.F.R. pt. 103); 63 Fed. Reg. 43,604, 43,606 (Aug. 14, 1998) (codified at 8 C.F.R. pt. 103); 63 Fed. Reg. at 12, 648 (1991 Regulation)).

23

286(m).'"[100]   Moya urges that, because this interpretation "'conflicts with the agency's earlier interpretation,'" it is "'entitled to considerably less deference than a consistently held agency view.'"[101]

I find that DHS has reasonably interpreted section 286(m) to include the full costs of operating USCIS because the function of USCIS is to provide adjudication and naturalization services.[102]   Certain costs may be more or less directly associated with the provision of those services, but fundamentally any cost that the agency incurs in fulfilling its statutory mandate to provide such services can be reasonably interpreted as falling under the "full costs of providing all such services."[103]   While this may not be the only reasonable interpretation of the statute, it is nonetheless a reasonable interpretation.  Similarly, DHS reasonably interpreted its authority to conclude that it could set fees at a rate that would fund the twenty-nine "enhancements," including the expenses of "adjusting staff, upgrading information technology systems, improving fraud detection and

---

[100]     *Id.* (quoting 2010 Regulation at AR 17087).

[101]     *Id.* at 20-21 (quoting *Immigration and Naturalization Servs. v. Cardoza-Fonseca*, 480 U.S. 421, 446 n.30 (1987)).

[102]     Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment ("Def. Opp. Mem.") at 29 (citing 72 Fed. Reg. at 29,866-67 (AR 16258-59)).

[103]     8 U.S.C. § 1356(m).

prevention capacity."[104]

Notably, the legislative history indicates that "after amending the statute to add the 'full costs' provision, Congress recognized that fees deposited in the IEFA account would fund the 'entire cost of operating the Adjudications and Naturalization program.'"[105] Defendants note that "according to a 1988 conference report accompanying section 286(m)'s enactment, Congress intended for the 'funds generated by [the IEFA] Account' to be used for '*enhancing naturalization*

---

[104]    Def. Mem. at 1.

[105]    Def. Opp. Mem. at 29 (quoting 1990 Appropriations Committee Hr. at 72).  I am not persuaded by Moya's attempt to create ambiguity in the meaning of this statement of congressional intent.  He notes that "just two sentences thereafter," the report states that "'[t]he resources to be made available [through the IEFA] will be used *to* adjudicate applications and petitions for benefits under the [INA] and to provide necessary support to adjudications and naturalization programs.'"  Pl. Opp. Mem. at 10 (emphasis added by Moya).  If anything, this statement strengthens defendants' position, insofar as it includes reference to "provid[ing] necessary support to adjudications and naturalization programs."  As additional context, I note that, as DHS indicated during the 2010 rulemaking period, Congress provides appropriations for certain USCIS programs.  "Providing these limited funds against the backdrop of the broad immigration examinations fee statute – together forming the totality of funding available for USCIS operations – requires that all other costs relating to USCIS and adjudication operations are funded by fees."  75 Fed. Reg. 58,966.  DHS stated further, "Congress and the Executive Branch have been in agreement that the full cost of operating USCIS should come from the sum of the general IEFA fee account, several other specific fee-driven provisions of the statute, and annual appropriated funds.  The balance of the funding between these accounts is struck by Congress in determining the annual appropriation, and DHS and USCIS negotiate that result with Congress and adjust as practical the total amount charged as fees, which is ultimately approved by Congress as the amount that may be expended."  *Id.*

*and adjudication programs.*'"[106]  This understanding by Congress persists, as

revealed in a recent House report stating that "'[r]evenues from fees paid by

persons applying for immigration benefits constitute the majority of USCIS's

revenues, and support adjudication of applications for immigration benefits as well

as government investigations aimed at preventing fraud within the immigration

system.'"[107]

     Contrary to Moya's assertion, the Supreme Court recently held that

when an agency changes its prior policy, the APA does *not* dictate a heightened

---

[106]    Def. Mem. at 27 (quoting H.R. Rep. No. 100-979 at 38) (emphasis added by defendants).  I am not persuaded by Moya's argument that this history is not relevant because it preceded the "relevant language of § 286(m)" by two years and the meaning of the quote has been taken out of context.  According to Moya, the entire passage reads, "'funds generated by this Account shall not be used for any purpose *other than* enhancing naturalization and adjudication programs. Additionally, naturalization and adjudication fees *shall not be* increased beyond the extent they would have been increased absent the existence of the Account.'"  Pl. Opp. Mem. at 10 (emphasis added by Moya).  This passage *does not* preclude program enhancement.  Furthermore, defendants point out that when section 286(m) was enacted, INS was responsible for both adjudication and enforcement, functions that were later assigned to USCIS and Immigration and Customs Enforcement, respectively, under the Homeland Security Act.  Accordingly, Congress's concern with "preventing INS from using application fees for enforcement purposes unrelated to the adjudication of benefits . . . is not relevant now."  Reply Memorandum in Further Support of DHS's Motion for Summary Judgment ("Def. Reply Mem.") at 10-11.

[107]    Def. Reply Mem. at 10 n.6 (quoting H. Rept. 112-91 at 119).

standard of review for the new policy.[108]  The agency

> need not demonstrate to a court's satisfaction that the
> reasons for the new policy are better than the reasons for
> the old one; it suffices that the new policy is permissible
> under the statute, that there are good reasons for it, and that
> the agency believes it to be better, which the conscious
> change of course adequately indicates.[109]

Therefore, the fact that the agency previously considered OMB Circular A-25 to be

controlling authority is irrelevant, as long as it now provides good reasons for

considering the Circular to be merely instructive.

In any case, I find that DHS's interpretation of "full costs" is

consistent with the broad definition of the term in OMB Circular A-25.  In both

cases, full costs includes direct and indirect costs.  The Circular specifically

includes "direct and indirect personnel costs," "physical overhead, consulting, and

other indirect costs," "management and supervisory costs," and the "costs of

enforcement, collection, research, establishment of standards, and regulation."[110]

Thus, even if OMB Circular A-25 were controlling, DHS would still have the

discretion to include its overall operating and infrastructure costs, as well as the

---

[108]     *See Federal Commc'ns Comm'n v. Fox Television Stations*, — U.S. —, 129 S.Ct. 1800, 1810 (2009).

[109]     *Id.* at 1811.

[110]     OMB Circular A-25 (AR 017181).

27

twenty-nine enhancements, in its definition of "full costs," and to set application fees at rates that would allow recovery of such costs. In sum, based on the statutory text, the legislative history, and the instructive authority of OMB Circular A-25, I find that DHS has reasonably interpreted its fee-setting authority under section 286(m) of the INA.

### 2.   DHS's Decision Was Neither Arbitrary Nor Capricious

In 2007 and the 2010, DHS significantly raised fees in order to cover the costs of USCIS's operations, including the costs of twenty-nine "enhancements." Each time, it did so after conducting a comprehensive review that led to the agency's reasoned conclusion that it could not fulfill its statutory duties without increasing revenue obtained from application fees.[111] Moya alleges that "[b]y including these enhancements in its cost calculations, USCIS passed all $524 million in system improvement costs onto applicants for immigration and

---

[111]    *See* 72 Fed. Reg. at 29,851-52 (AR 16243-44); 75 Fed. Reg. at 33,446-49 (AR 17036-39). Notably, in 2010, DHS indicated its intent to review the IEFA every two years going forward, commenting that "[t]he 2008/2009 Fee Rule followed nearly a decade without a comprehensive review of IEFA fees, and fees increased by a weighted average of 86 percent . . . . By reviewing the IEFA every two years, USCIS is able to implement more moderate fee changes and avoid periods of inadequate revenue that typically precede large fee increases. Additionally, conducting a comprehensive review every two years will allow USCIS to incorporate the productivity gains achieved from investments in technology and modernization of agency operations . . . . [which] should result in improved performance and lower costs." 75 Fed. Reg. at 33,449 (AR 17039).

28

naturalization benefits."[112]  Moya objects to the agency using applicant fees to fund any of these enhancements because they benefit the public, rather than the individual applicants, and are unrelated to processing applications for immigration and naturalization benefits.

The 2007 and 2010 fee schedules were promulgated in accordance with notice-and-comment rulemaking procedures.  During the rulemaking periods, DHS accepted public comments, including many that Moya has raised in the instant litigation, and gave due consideration to such concerns.  In both 2007 and 2010, DHS published final rules that included certain adjustments and waivers based on the public comments it had received, and that provided full and reasoned explanations for the decisions it made.[113]  There is no indication that DHS abused its discretion in promulgating the fee regulations.  DHS did not "rel[y] on factors which Congress [did] not intend it to consider," "fail[] to consider an important aspect of the problem," or "offer[] an explanation for its decision that runs counter to the evidence before the agency."[114]

---

[112]   Pl. Mem. at 8.

[113]   *See* 72 Fed. Reg. at 29,851-54 (AR 16243-46); 75 Fed. Reg. at 58,965 (AR 17080-83).

[114]   *Bellevue Hosp. Ctr.*, 443 F.3d at 174 (quotation marks and citation omitted).

Because I have found that the agency has reasonably interpreted its fee-setting authority to fund the entire agency budget, minus appropriations, with fees, and did not abuse its discretion in doing so, I find that it is also appropriate for the agency to have incorporated the cost of improvements in its calculation of fees. Moya's suggestion that any such system-wide improvements should have been funded by additional appropriations from Congress is irrelevant to my assessment of whether the agency has acted within its discretion.[115] The question is not whether the agency could have taken a different tack, but whether the tack that it took is permissible under the statute and is an appropriate exercise of discretion. I answer both in the affirmative.

### 3. DHS's Interpretation of Section 286(m) Does Not Render the Provision Unconstitutional

I do not find that DHS's interpretation of section 286(m) would render

---

[115]    Pl. Mem. at 30.  Responding to comments that USCIS seek appropriated funds to close funding gaps, the agency wrote "[t]hese comments go beyond the scope of the regulation and raise questions of whether Congress should alter the immigration  laws of the United States or appropriate general funds for USCIS.  In effect, these comments suggest that USCIS should take other actions outside the rulemaking under INA section 286(m), 8 U.S.C. § 1356(m)." 72 Fed. Reg. at 29,860 (AR 16252). "Part of USCIS' funding problem has been reliance on temporary funding sources, including appropriated funding.  This new fee schedule will establish a more stable source of funding.  As the number of applications and petitions increases, USCIS will be better able to respond to increasing workload changes and will no longer be compelled to sacrifice customer service or rely on unreliable funding sources."  72 Fed. Reg. at 29,861 (AR 16253).

it an unconstitutional delegation, "or . . . raise substantial constitutional concerns."[116]  Moya argues that DHS's interpretation of its fee-setting authority is constitutionally problematic under long-standing Supreme Court precedent distinguishing between user fees, which agencies may charge for services they render, and taxes, which only Congress may constitutionally impose.[117]  In his view, DHS's interpretation leads to the conclusion that Congress authorized the agency to charge fees "'to recoup some of the general costs to the Government of operating a particular regulatory scheme.'"[118]  Such "fees" would actually constitute taxes, without Congress having provided any "intelligible principle" limiting DHS's authority.[119]

Pursuant to the doctrine of constitutional avoidance, "'every reasonable construction must be resorted to in order to save a statute from unconstitutionality.'"[120]  Therefore, Moya urges this Court to conclude that Congress did not intend to delegate to DHS the authority to charge such fees.  I

---

[116]   Pl. Mem. at 21.

[117]   *See id.* at 13 (citing *NCTA*, 415 U.S. at 340; *NEPCO*, 415 U.S. at 346).

[118]   *Id.* (quoting *Seafarers*, 81 F.3d at 186).

[119]   *Id.* at 22 (quoting *NCTA*, 415 U.S. at 342).

[120]   *Id.* (quoting *Edward DeBartolo Corp. v. Florida Gulf Coast Bldg & Constr. Trades Council*, 485 U.S. 568, 575 (1988)).

find that the the Supreme Court precedent cited by Moya does not lead to the

conclusion that DHS's interpretation of section 286(m) renders the delegation

unconstitutional.

In *National Cable Television Association v. United States* ("*NCTA*"),

the Supreme Court considered an agency's imposition of annual fees on the entities

subject to its regulation under the IOAA, holding that

> [t]axation is a legislative function, and Congress, which is
> the sole organ for levying taxes, may act arbitrarily and
> disregard benefits bestowed by the Government on a
> taxpayer and go solely on ability to pay . . . . A fee,
> however, is incident to a voluntary act . . . . The public
> agency performing those services normally may exact a fee
> for a grant which, presumably, bestows a benefit on the
> applicant, not shared by other members of society.[121]

The Court stated "[i]t would be such a sharp break with our traditions to conclude

that Congress had bestowed on a federal agency the taxing power that we read [the

IOAA] narrowly as authorizing not a 'tax' but a 'fee.'"[122]  The Court concluded

that "[t]he phrase 'value to the recipient' is . . . the measure of the authorized

fee."[123]

In *Federal Power Commission v. New England Power Company*

---

[121]   *NCTA*, 425 U.S. at 340.

[122]   *Id.*

[123]   *Id.* at 342-43.

("*NEPCO*"), a companion case, the Court endorsed the interpretation of the IOAA given by OMB Circular A-25.  The Circular stated that "a reasonable charge 'should be made to each identifiable recipient for a measurable unit or amount of Government service or property from which he derives a special benefit,'" and that "no charge should be made for services rendered, 'when the ultimate beneficiary is obscure and the service can be primarily considered as benefitting broadly the general public.'"[124]

The lower courts have often interpreted these two cases as distinguishing between "a permissible *user fee* and an unconstitutional *tax*,"[125] and accordingly, have upheld fees as long as the agency imposes "'specific charges for specific services to specific individuals or companies.'"[126]  Articulated in a slightly different manner, "an agency could not assess fees, purportedly in the 'public interest,' to recoup some of the general costs to the Government of operating a particular regulatory scheme."[127]

The instant case is factually distinguishable from *NCTA* and *NEPCO*

---

[124]     *NEPCO*, 415 U.S. at 349-50.

[125]     *Seafarers*, 81 F.3d at 182 (original emphasis).

[126]     *Id.* at 183 (quoting *NEPCO*, 415 U.S. at 349).

[127]     *Id.*

in at least one important respect.  Those cases "involve[] a regulatory agency's attempt to shift wholesale the cost of regulations to the regulated entities, regardless of whether the entities requested or received *any* agency service."[128] Here, by contrast, DHS is "collecting application fees to fund programs and operations connected with adjudicating specific applications or requests."[129]  The fees assessed by DHS are valid because they remain "specific charges for specific services to specific individuals or companies."[130]  No principle laid out in *NCTA* or *NEPCO* prohibits the agency from setting fees based on "'the total cost of providing services,'" including both direct and indirect costs.[131]  Furthermore, to the extent that Moya is suggesting that DHS cannot include the costs of programs that also serve the public interest, such as its anti-fraud enhancement projects, it is established law that agencies are not "required to segregate public and private benefits."[132]

I find instructive the D.C. Circuit's analysis in *Florida Power & Light*

---

[128]    Def. Opp. Mem. at 27 (citing *NCTA*, 415 U.S. at 337-38; *NEPCO*, 415 U.S. at 351) (emphasis added).

[129]    *Id.*

[130]    *NEPCO*, 415 U.S. at 349.

[131]    Def. Opp. Mem. at 27 (quoting *MPLCO*, 601 F.2d at 227, 230-31).

[132]    *MPLCO*, 601 F.2d at 229.

*Co. v. United States* ("*FPLCO*"), a case challenging fees assessed by the Nuclear

Regulatory Commission under the Consolidated Omnibus Budget Reconciliation

Act of 1985 ("COBRA").[133]   The D.C. Circuit held in that case that the

"'constitutional problem' actually discussed and avoided by the Court [in *NCTA*]

was the delegation of congressional power to agencies without Congress setting

standards for their guidance," rather than a "metaphysical distinction" between

"fees" and "taxes."[134]

      The court considered whether COBRA laid down "'an intelligible

principle'" that would render the delegation permissible, noting that it is the

challenger's burden to show that the standards were unintelligible.[135]   The standard

in COBRA "establishes a legislative policy that NRC collect up to thirty-three

percent of its budget from fees 'reasonably related to the regulatory service

provided by the Commission' and that the fees 'fairly reflect the cost to the

Commission of providing such service.'"[136]   The court found this authorization

distinct from IOAA and "much more precise than delegations upheld by the

---

[133]    *Florida Power & Light Co. v. United States*, 846 F.2d 765 (D.C. Cir. 1988).

[134]    *Id.* at 773.

[135]    *See id.*

[136]    *Id.*

Supreme Court" in earlier cases.[137]  Significantly, the court noted that "in only two cases in all of our jurisprudence has the congressional delegation to an agency been invalidated on the ground that Congress has delegated power without sufficient standards."[138]

Similarly, DHS's fee-setting authority derives from section 286(m) of the INA, not the IOAA,[139]  I find that Congress has provided an intelligible principle limiting its delegation under section 286(m), quite similar to the COBRA language that the D.C. Circuit upheld in *FPLCO*.  To wit, section 286(m) provides that "fees for providing adjudication and naturalization services may be set at a level that will ensure recovery of the full costs of providing all such services,

---

[137]     *Id.* (citing *Lichter v. United States*, 334 U.S. 742 (1948); *American Power & Light Co. v. Securities & Exch. Comm'n*, 329 U.S. 90, 97 (1946); *Yakus v. United States*, 321 U.S. 414, 426 (1944); *Federal Power Comm'n v. Hope Natural Gas Co.*, 320 U.S. 591, 600 (1944); *National Broadcasting Co. v. United States*, 319 U.S. 190, 225–26 (1943); *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 397 (1940); *New York Cen. Sec. Corp. v. United States*, 287 U.S. 12, 24 (1932)).

[138]     *Id.* (citing *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 553 (1935); *Panama Ref. Co. v. Ryan*, 293 U.S. 388 (1935)).

[139]     *See* 72 Fed. Reg. 29,866 (AR 016258) ("USCIS authority under section 286(m) of the INA is an exception to any limitation of the IOAA" and "broader than the IOAA"); *see also* 72 Fed. Reg. 29,867 (AR 016259) ("[w]hile section 286(m) of the INA is a separate authority for the cost analysis and fees . . . USCIS follows the procedures outlined in OMB Circular A-25 and standard accounting procedures as discussed in the proposed rule *to the extent that they are applicable*.") (emphasis added).

including the costs of similar services provided without charge to asylum

applicants or other immigrants."   The agency has been instructed by Congress to

recover the costs of its provision of services; to recover the *full* costs of providing

such services; and to recover those costs by charging fees for the provision of

services.   This delegation is no less specific than the COBRA delegation upheld by

the D.C. Circuit.   Therefore, I find that DHS's interpretation of its fee-setting

authority under section 286(m) does not pose any constitutional difficulty.

### B.   DHS Reasonably Exercised Its Discretion in "Bundling" Application Fees

#### 1.   A Combined Fee Is Permissible Under Section 286(m)

Moya argues that DHS has impermissibly bundled multiple services

into one fee, thereby charging many applicants for services that they do not want

and which some cannot use.[140]   Beginning in 2007, DHS began to bundle Form I-

485 – the application for permanent residency – with two "interim benefits," which

permanent residency applicants sometimes seek.   Those benefits are (1) an

Application for Travel Document (Form I-131), and (2) an Application for

Employment Authorization (Form I-765).[141]

Moya posits that the decision to bundle fees in this manner is arbitrary

---

[140]   *See* Pl. Mem. at 31.

[141]   *See id.*

and capricious, and thus an abuse of agency discretion.[142]  He argues that the agency's previous practice of charging separate fees for each application belies the agency's representation that it "'would be too complicated and costly for USCIS to administer' 'multiple fee options based on who typically requests . . . benefits, when records indicated that the vast majority of applicants do request interim benefits.'"[143]  However, Moya has taken the agency's statement out of context in a misleading fashion.

In fact, the agency indicated that it would be "too complicated and costly" to have a system in which individuals could opt to pay a combined fee if they were interested in interim benefits, or to pay a separate fee if they were not – in essence, multiplying the options from the former fee schedule.[144]  Defendants note that, during the rulemaking period, "DHS made available its workload projections, which showed that the policy change would result in a significant reduction in the volume of applications to be adjudicated."[145]  Oddly, Moya urges

---

[142]    *Id.*

[143]    *Id.* at 31-32 (quoting 72 Fed. Reg. at 29,862 (AR 1427) and citing 75 Fed. Reg. at 58,968 (AR 17086)).

[144]    *See* Def. Opp. Mem. at 34.  *See also* 72 Fed. Reg. at 29,861-62 (AR 16253-54).

[145]    Def. Opp. Mem. at 33 (citing 2007 Fee Rule Final Summary at 57 (AR 1397)).

precisely what the agency determined would be the most complicated and costly to administer – offering optional bundling.[146]  Moya claims that the agency has not addressed at all "whether system costs would be higher (and by how much) if [] applicants were offered the choice of taking or not taking the bundle[.]"[147]  But that is *precisely* what the agency addressed in its responses to public comments, deciding that the system costs would be higher if applicants were offered the choice.

Moya also critiques DHS's factual assertion that "'the *vast majority* of applicants do request interim benefits,'"[148] pointing out that in the 2007 Regulation, the agency asserted only that it "'believes that the average adult customer files two [applications for work authorization benefits] . . . [and a]bout 40% filed at least one [application for a travel document] and 20% would file a second.'"[149]

Moya argues that for "many" permanent residency applicants "the travel document is worthless because traveling outside of the United States would

---

[146]    *See* Reply Memorandum of Law in Further Support of Plaintiff's Motion for Summary Judgment ("Pl. Reply Mem.") at 18.

[147]    *Id.*

[148]    Pl. Mem. at 32 (quoting 72 Fed. Reg. at 29,862 at AR 1427) (emphasis added).

[149]    *Id.* (quoting 2007 Supporting Documentation at AR 2514).

cause serious harm."[150]  Specifically, individuals who have been unlawfully present in the United States may be inadmissible for certain periods of time if they leave the country, and the issuance of a travel document does not waive those grounds of inadmissibility.[151]  Similarly, federal law generally prohibits the employment of individuals under the age of sixteen and restricts the categories of employment for individuals between sixteen and eighteen.[152]  DHS statistics reveal that for FY 2006-FY 2009, almost fifteen percent of applicants were under the age of fifteen and thus, could not have used the work authorization benefit.[153]  Therefore eighty-five percent – which surely qualifies as the "vast majority" – *could* legally work if they received the work authorization benefit.[154]

In summary, Moya argues that by charging applicants for two benefits

---

[150]  *Id.* at 33.

[151]  *See id.* (citing 8 U.S.C. § 1182(a)(9)(B) (establishing that an alien unlawfully present in the United States for more than 180 days but less than one year, and who leaves the country, is inadmissible for a period of three years, except in certain circumstances, and an alien unlawfully present in the United States for one year or more and leaves the country is inadmissible for ten years)).

[152]  *See id.* at 33-34.

[153]  *See id.* at 34.

[154]  Of course, there are likely applicants who, despite being age-eligible, cannot work for other reasons, such as disability, responsibility for young children, or related reasons.  However, because neither party has presented any data on such individuals, I cannot speculate as to whether that represents any significant percentage of applicants.

that they may or may not ever want or use, "the result is that the agency receives millions of dollars in fees that not only lack any connection with the provision of services, but lack any connection with any identifiable agency activity of any kind."[155]   Accordingly, they "are charged *more than the full cost* of the services they receive."[156]

Moya is correct if one calculates "full cost" in the narrowest sense. However, I find that the agency has reasonably interpreted "full costs" in a more expansive fashion, and thus, the agency's decision to combine fees remains "permissible under the statute."[157]   Section 286(m) gives the agency wide discretion and does not impose a specific requirement that DHS aggregate or segregate the fees for particular types of benefits.[158]   User fees need not "be precisely calibrated to the use that a party makes of Government Services."[159]   Nor is there any legal requirement of "complete fairness," which would often be impractical.[160]   Instead, the standard is whether the fee represents a "fair

---

[155]   *Id.* at 35.

[156]   *Id.* (emphasis in original).

[157]   *Fox Television Stations*, 129 S. Ct. at 1811.

[158]   *See* Pl. Mem. at 32.

[159]   *United States v. Sperry Corp.*, 493 U.S. 52, 60-61 (1989).

[160]   *Massachusetts v. United States*, 435 U.S. 444, 463-64 (1978).

approximation of the cost of benefits supplied."[161]   In this case, the agency

explained the process by which it determined the various fees included in the 2007

and 2010 fee schedules, charging more for applications that are more complex to

process.[162]   Therefore, I find that the fees are a "fair approximation," even if not

"precisely calibrated."

### 2.   DHS Provided a Reasonable Explanation for the Combined Fee

I find that DHS's decision to shift from three separate fees to a

combined fee was not arbitrary or capricious.  DHS provided two reasons for

making the shift.  *First*, DHS determined that the combined fee policy would

reduce the workload for the agency, and thus, processing costs.[163]  As DHS

acknowledged in its response to public comments during the rulemaking period, *a

la carte* pricing would lower costs for certain permanent residence applicants, but,

compared to a combined fee, *a la carte* pricing would result in greater costs and

---

[161]      *Id.* at 463 n.19.

[162]      *See* 72 Fed. Reg. at 29,862 (AR 16254) (explaining a particular fee
calculation that was "consistent with the methodology employed . . . in that an
identifiable adjudication was segregated and the relative complexity of processing
the benefit for a subset of applicants was determined.").

[163]      Def. Opp. Mem. at 33 (citing 72 Fed. Reg. at 4,894 (AR 1755)).

administrative burden on the agency overall.[164]   DHS considered public comments to the contrary, but, after balancing the competing interests, exercised its policy judgment, "offer[ing] a complete, reasoned basis for both its decision to propose a combined fee system, and for choosing to adhere to that system over the alternative suggested by public comments."[165]

*Second*, DHS determined that the policy would create a "better alignment of incentives . . . between revenue and timeliness."[166]   The new fee structure "addresses the historic perception that because of the Congressional requirement that USCIS be self-funded from fees, USCIS may make decisions that compromise operational efficiency to ensure revenue flow."[167]

Although the agency does not bear a heightened burden to explain a shift in policy, the Supreme Court recently held that an agency may not "depart

---

[164]   *Id.* at 34 (citing 72 Fed. Reg. at 29,862 (AR 16454)).

[165]   *Id.*

[166]   *Id.* at 33 (citing 72 Fed. Reg. at 4,894 (AR 1755)).  Moya argues that the agency is "essentially admitting that prior to bundling USCIS was motivated to delay processing Form I-495 applications to force pending applicants to apply for interim benefits."   Pl. Reply Mem. at 18.   However, Moya confuses the agency's point.   As the agency explained during the rulemaking process, the separate fee structure "create[d] *the perception* that USCIS gain[ed] by processing cases slowly." 72 Fed. Reg. at 4,894 (AR 1755) (emphasis added).

[167]   *Id.*

43

from a prior policy *sub silentio* or simply disregard rules that are still on the books."[168]   Here, DHS has explained its decision to shift from charging separate fees to charging a bundled fee, and I find that it has provided adequate justification for its decision.   Whether or not the agency made the *best possible decision*, the agency's policy decision to combine fees was rational and reasoned, and permissible under the statute.[169]   Where "there are several different possible responses to a given problem, more than one of which may be rational," judicial review is limited to determining whether the agency has explained its response and whether its response is rational.[170]   Therefore, I conclude that there is no reason for this Court to "substitute [its own] policy judgment for that of the agency."[171]

## V.   CONCLUSION

---

[168]     *Fox Television Stations*, 129 S.Ct. at 1811.

[169]     Moya cites two reports published by the Government Accountability Office in January 2009, criticizing the accounting procedures used by DHS in adjusting the fee schedule.   *See* Pl. Mem. at 8 (citing *Immigration Application Fees: Costing Methodology Improvements Would Provide More Reliable Basis for Setting Fees* (AR 17289) and *Federal User Fees: Additional Analyses and Timely Reviews Could Improve Immigration and Naturalization User Fee Design and USCIS Operations* (AR 17337)).   Those critiques may be accurate – and perhaps DHS will fine tune its budgeting methods in the future – but that does not alter my conclusion that DHS's decisions were rational, reasoned, and permissible.

[170]     *The Fund for Animals v. Kempthorne*, 538 F.3d 124, 136-37 (2d Cir. 2008).

[171]     *Bellevue Hosp. Ctr.*, 443 F.3d at 174.

For the reasons stated above, Moya's motion for summary judgment is denied and defendants' motion for summary judgment is granted.  The Clerk of the Court is directed to close the motions [Docket No. 15 and 17] and this case.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      October 11, 2011
            New York, New York

45

**- Appearances -**

**For Plaintiff:**

Scott Alan Rosenberg, Esq.
Amy Valor Meselson, Esq.
The Legal Aid Society
199 Water Street, 3rd Floor
New York, NY 10038
(212) 440-4226

Mary Jane Eaton, Esq.
Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, NY 10019
(212) 728-8000

**For Defendants:**

Li Yu
Assistant United States Attorney
U.S. Attorney's Office
86 Chambers Street
New York, NY 10007
(212) 637-2734